## CHULAN & CO. *vs.* PRINCEVILLE PLANTATION CO.

### APPEAL FROM THE DECISION OF McCULLY, J.

### SPECIAL TERM, DECEMBER, 1883.

### JUDD, C. J.; McCULLY and AUSTIN, JJ.

By an agreement made between the defendants and the plaintiffs, the defendants agreed to rent to the plaintiffs certain rice lands, containing from 300 to 700 acres, for a term of five years, and to put the plaintiffs in possession of all over 300 acres when the plaintiffs' manager should elect; the rent to be at the rate of $20 per acre. The agreement contained a stipulation that a lease in duplicate should be thereafter executed.

Held that the plaintiffs were bound to pay rent for all lands delivered to and accepted by them suitable for rice cultivation.

Held also that interest was recoverable, from the date of the writ, on the amount of rent then due, and to become due, on the acreage for which the plaintiffs were liable to pay.

### OPINION OF THE COURT, BY JUDD, C. J.

The bill of complaint avers that the defendant corporation made an agreement with the plaintiffs, dated March 1, 1880, which is as follows:

"Whereas, the Princeville Plantation, a corporation only (duly) organized under and by virtue of the laws of the Hawaiian Kingdom, has agreed to rent to Chulan & Co., merchants, doing business in Honolulu, Oahu, certain lands situate in Hanalei, Island of Kauai, for the purpose of cultivating rice, and the said Princeville Plantation Company and the said Chulan & Co. do hereby agree to sign, seal and execute a lease in duplicate, to be hereafter prepared upon the terms and conditions as are hereafter named and expressed. The Princeville Plantation Company agree to lease from 300 to 700 acres of land, to be used only in the cultivation of rice, at said Hanalei, and put Chulan & Co., or their agents, in possession of all lands over 300 acres as soon as the manager elects to do so, the 300 acres to be taken possession of immediately, for the term of five years, with a privilege of an extension of the said lease for a further period of five

years, upon the same terms and conditions of the present lease, at the yearly rental of $20 per acre, payable quarterly. Also, that the Plantation Company will not lease any other land in Hanalei Valley, for the purpose of cultivating rice, to any person or persons, without the consent of Chulan & Co.; also, to allow said Chulan & Co. to cut deadwood from lands owned or controlled by the Plantation Company for fencing, posts and household purposes, but such cutting shall be done under the management and control of the Manager of the Plantation Company; also, to furnish all the water necessary for the cultivation of said land with rice; also, pasturage upon the lands owned or controlled by the Plantation Company for the horses and cattle of Chulan & Co. used in working and cultivating the land; also, that in every 100 acres of land, two acres shall be allowed, rent free, for erection of houses for Chulan & Co.'s laborers; that said Chulan & Co. shall not sublet or assign the lands, or any part thereof, without the consent, in writing, of said Plantation Company, nor in any manner interfere with the Plantation labor; also, that the rent of the 300 acres shall commence on the 1st day of April, 1880, and the balance of said land, up to 700, from date of possession being given. In witness whereof," etc.

That, pursuant to this agreement, defendant, by its agent, C. Koelling, about 1st April, delivered to plaintiffs, and plaintiffs took possession of all land marked on a map (Rowell's) 1, 2, 3, 5 6, 7, and defendant stated to plaintiffs it was of the area of 300 acres, and demanded rent therefor. That defendant, about 1st July, 1880, delivered to plaintiffs, and plaintiffs took possession of, lot 4, on said map, and stated that the area was 55½ acres, and also that certain other pieces, then delivered, contained 8.08 acres, and demanded rent. That plaintiff paid the rent, believing that the statements were true, to 1st April, 1882. That no survey of the premises was made at the time of agreement. That plaintiffs enclosed the land with a fence when it was delivered to them, and the fence now encloses all the land at any time in their possession. Plaintiffs suspected, from the low yield, that the acreage under cultivation was less than was stated by defendant, and caused a survey to be made, by which it appears only 303.06 acres were in their possession. That then

plaintiffs refused to pay rent, as claimed by defendant, on 363.58 acres, but offered to pay on 303.06 acres, and demanded of defendant repayment of the excess of rent paid. Defendant refused to accept the rent offered or to pay back the excess, and brought action in the District Court to recover possession of the premises for non-payment of rent. The bill prays that defendant be ordered to execute a lease for 303.06, or such number of acres as the Court may find to be in plaintiffs' possession, and to order the defendant to pay back the excess of rent, and to accept the arrears of rent due on the basis of 303.06 acres; for an injunction against the suit, and general relief.

The answer admits the agreement, and alleges, in substance, that defendant delivered, March, 1880, to plaintiffs 339½ acres of rice land, but plaintiffs being dissatisfied with 24 acres thereof, as unsuitable for rice, defendant took them back, leaving 315½ acres in plaintiffs' possession; that July 1st, 1880, they delivered plaintiffs another tract of 55½ acres, and that then plaintiffs had 371 acres; deducting two acres per hundred, as per agreement, there would remain 363.58 acres, on which rent had been demanded and paid to April 1st, 1882.

That a survey was made before any of the premises were delivered, and that when possession was given, the boundaries were pointed out by Monsarrat and Koelling, and that plaintiffs accepted Monsarrat's survey; and denies that plaintiffs' survey shows the area of land kept in possession by them, and avers that a large portion of the land so delivered suitable for rice culture, has not been planted; that defendant has offered to take back certain portions of land left idle by plaintiffs, but they refused to surrender the same, and other formal matters are denied.

The rights of the parties hereto are to be determined by the agreement, and it seems to us that it ought to be construed as a lease. It transfers the possession of the land, stipulates the annual rent payable per acre, and contains the covenants and conditions agreed upon. The rent of the 300 acres was to begin 1st April, 1880, and for the remainder, up to 700 acres, from date of possession given.

Taylor's Landlord and Tenant, Sec. 43, reads: " From a consideration of the cases the rule would appear to be, that if the

instrument professing to be an agreement for a lease is itself a transfer of possession, whether immediate or *in futuro,* it is a lease, although it contains a stipulation for executing a subsequent lease." For the "300 acres to be taken possession of immediately," it seems to be admitted by the plaintiffs that the agreement was a lease. The plaintiffs urge that there is no tenancy between the parties established by the agreement beyond this area of land, and that they are only liable, for use and occupation, for the amount of land over 300 acres actually occupied by them. The defendant claims that the plaintiffs should be holden for rent of whatever land over the 300 acres was delivered to the plaintiffs.

We think the plaintiffs are bound to pay rent for whatever land was delivered by the defendant and accepted by the plaintiffs, without reference as to whether the same was thereafter planted or not by plaintiffs. This must, however, be qualified. The land must be such as is suitable for rice culture. The land was to be "used only in the cultivation of rice," and this implies that it was to be rice land, capable, by an ordinary expenditure of money in preparation, of growing rice. The plaintiffs were not bound to take land which, with an extraordinary expenditure of labor and money, might possibly be made to grow rice, but land reasonably level, so as to be easily laid out in patches and capable of being put under water as required. That the agreement was so understood by the parties is evident from the fact that the plaintiffs surrendered a piece of land of twenty-four acres (Lot "Y" of Monsarrat's map) as being unsuitable for rice, and it was accepted by defendant. It must also be land upon which water could be brought from ditches or streams convenient and accessible. We do not think it necessary in this case to decide whether the words in the agreement binding the defendants to "furnish all the water necessary for the cultivation of said land with rice," compels them to cut and keep in repair the necessary canals to lead water to the land cultivated in rice by plaintiffs, for there is no allegation in the bill setting forth any default of this character by the defendant. It might be said, however, that in default of a particular covenant by the lessors to that effect, it is not to be implied that they were to expend money

and labor in the cutting of ditches to lead the water to the plaintiffs' rice fields, and that the action of the plaintiffs in making their own ditches is an indication of the way they interpreted the agreement.

The plaintiffs were bound to take whatever land of this character was delivered them by defendants up to 400 acres, additional to the 300 acres.

But rice land "furnished with water" means land for which enough water for the successful growing of crops of rice is reasonably accessible, and without charge to the plaintiffs for the use of such water.

Having settled these principles, there remains to be considered how much land of this character was delivered to the plaintiffs.

The plaintiffs claim that they are only liable for rent for 303.06 acres, as shown by the Rowell map, and the defendants claim rent for 363.58 acres, as shown by the Monsarrat map.

The difference between the parties is 60.52 acres, and it is made up of various parcels of land in Hanalei valley, in close proximity to the plaintiffs' rice fields.

The largest parcel in dispute is a lot of 24.69 acres, which is in the upper end of "Field A" in the Monsarrat map, marked "Lot F." The remaining difference is 41.91 acres, comprising lots "B, C, D, E" and "G" on the Monsarrat map.

A reference to the map makes it clear that these disputed parcels all bordered upon land taken and planted by plaintiffs as suitable for rice; they are, in fact, ends or remnants of such fields, and the territory is all within certain well defined natural boundaries, i. e., the Hanalei river on two sides, the foothills on another side, and the "Pohanui" stream on the remaining side.

Mr. Koelling, the defendants' manager, says he delivered all of "Field A" (including "Lot F") to Chung Fook, representing plaintiffs, in March, 1880. He says he "went over the whole of the lot with him, and showed him the boundaries as laid down (in Monsarrat's map). He did not object to any part of it. It is very good soil, and all bottom land; was planted with cane. I laid out ditch in upper corner; spent two days leveling to show them where to bring on water. No part of 'Field A' is higher than the ditch." Chung Fook says: "We got lots 6 and 7 in

March, 1880." Lots 6 and 7, with the piece "F," comprise "Field A" of the Monsarrat map. "No land above 7 (lot 'F') is suitable for cultivation. Outside of where I cultivate in lot 7 is about ten feet above the river. Water cannot be taken on to the highest part above lot 7, and that is the only reason I do not plant it; it is good land."

Mr. Bertleman says that lot "F" is a little lower than 7, three or four feet above the river. "Certainly it is fit for rice culture. They want low land. There is good manienie grass there, and some bushes. The Chinamen have had their cattle there since they took possession." Mr. G. N. Wilcox says the piece marked "F" could be planted; not so flat as the rest of the valley. The part next the river might be subject to freshets.

Richard Gerke says of this tract of land that he examined it, and it was rich, alluvial soil, and not so much subject to floods as some other places then planted by plaintiffs. He applied to Chung Fook to lease this land to him, and received the reply that this was not allowable by the term of the lease, and that by and by they would plant it themselves. That the place was grown up with bushes and grass, and had cattle on it that looked well.

We think that the effect of this testimony is, that not only was this lot delivered to plaintiffs, but that its possession was retained by them. It cannot properly be urged that the plaintiffs are not liable to pay rent for this piece, because they use this lot for pasturage under the agreement that defendants are to "furnish pasturage upon the lands owned or controlled by the Plantation Company for the horses and cattle of Chulan & Co., used in working and cultivating the land." The plaintiffs' cattle were to be pastured on pasture land, free of charge, presumably in common with the defendants' cattle, and not upon land which is suitable for rice culture, and delivered as such. Lot "G," containing two or three acres, is declared by Messrs. Bertleman and Wilcox to be perfectly suitable for rice.

The lots "B" and "C" lie on three sides of lot 1, of Rowell's map, which plaintiffs plant with rice. Mr. Bertleman says of these lots that they are adapted for rice and have been planted in cane. Mr. Wilcox says of them: "I see no reason why they should not be planted in rice."

11

Lot " C " had been prepared for rice, but abandoned.   Mr. Rowell, who surveyed these lands in 1880, says there were several patches around lot 1 prepared, but evidently abandoned.

As to lots " D " and " E," both Mr. Bertleman and Mr. Wilcox say they are now grown up with rushes, and are boggy and swampy; but it is said that their present condition is owing to neglect of draining during two or three years past.   On the other hand, Mr. Rowell says that the land above 2 and 3 (lots " D " and " E ") was swampy and rush-grown, and seemed to be blighted near the sour water, and that this swamp was not caused by not keeping drains open.

We are of opinion that these lots cannot be considered as suitable for rice culture, and so exempt the plaintiffs from liability to pay rent therefor.

Let a reference be made to the Clerk of the Court to ascertain the acreage of lots " D " and " E " of swampy, rush land, and on the coming in of this report a decree will be signed ordering the defendants to execute a lease in accordance with the agreement for 363.58 acres of land, less the acreage of lots " D " and " E," and that the parties settle their accounts on the above basis.

*A. S. Hartwell*, for plaintiffs.

*F. M. Hatch*, for defendants.

Honolulu, January 30, 1884.

SUPPLEMENTAL OPINION.

The decision having been filed on the 30th of January, counsel for the respective parties come before the Court, and counsel for plaintiffs claims that the plaintiffs should not pay interest on the amount found due by the Court.

The defendants claim interest on each item of rent, as it became due, on the acreage established by the Court, which is more than the acreage claimed to be chargeable by plaintiffs, and less than that claimed by defendants.   As the acreage upon which the claim was based was uncertain, and was the subject of controversy in this action, the claim for its rent was an unliquidated claim.   No demand is shown to have been made for the sum found due by the Court, nor was there any tender of this sum by the plaintiffs.   The rule of law in such a case as this is, that interest is recoverable from the date of the writ, upon the

amount then due, and upon the sums thereafter becoming due, in accordance with the terms of the agreement, upon the acreage as found by the Court. We consider that the proceedings in this case are equivalent to an action by defendants to recover their rent. Interest is therefore allowed, as above, from December 4, 1882, the date of the writ.

The question is made as to the area of the land upon which the Court held that the plaintiffs were not chargeable for rent. From the proofs before us, we held that lots "D" and "E," as marked and testified to at the trial, were sufficiently definite. The only question left open was as to the area of the lots so marked, and to determine which the reference was made.

We think that costs should be divided.

Decree accordingly.